507 So.2d 240 (1987)
Charles T. FLOWERS
v.
DEPARTMENT OF REVENUE AND TAXATION.
No. 86 CA 0029.
Court of Appeal of Louisiana, First Circuit.
April 14, 1987.
On Rehearing May 29, 1987.
Stanley K. Hurder, Baton Rouge, for appellant.
Robert F. Smith, Staff Atty., Dept. of Revenue and Taxation, Office of the General Counsel, Baton Rouge, for appellee.
Robert R. Boland, Jr., Civil Service Legal Counsel, Dept. of State Civil Service, Baton Rouge, for Herbert L. Sumrall, Dept. of Civil Service.
Before EDWARDS, WATKINS and Le BLANC, JJ.
WATKINS, Judge.
Charles T. Flowers was terminated from his position as Auditor III with the State Department of Revenue and Taxation for having made threats against other personnel with that Department. He appealed to the State Civil Service Commission, which issued an opinion affirming Mr. Flowers' termination. Mr. Flowers has now appealed to this Court.
We find that the State Civil Service Commission did not abuse the great discretion accorded it in matters of termination. LSA-R.S. 49:964 G(5). We also note that Mr. Flowers was given an opportunity to respond after having been given a letter of termination. The due process requirements of Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 *241 S.Ct. 1487, 84 L.Ed.2d 494 (1985) were thus met. We annex the opinion of the Commission which fully discusses the issues and sets forth the applicable law.
The opinion of the State Civil Service Commission is affirmed, at appellant's cost.
AFFIRMED.

APPENDIX
In re Appeal of Charles T. Flowers (Department of Revenue and Taxation)

STATE OF LOUISIANA

CIVIL SERVICE COMMISSION

DOCKET NO. 5002

Oct. 7, 1985

OPINION

STATEMENT OF THE APPEAL
Appellant was employed by the Department of Revenue and Taxation as an Auditor III and was serving with permanent status.
By letter dated February 8, 1985, over the signature of Ralph Slaughter, Assistant Secretary, Group I, appellant was advised that he was being removed from his position effective upon receipt of the letter. As cause for this action, the letter recites that on January 22, 1985, at 3:00 p.m., Dr. C. Gary Pettigrew, a Clinical Psychologist, called Benjamin Morrison, the Assistant Director of Field Examination Services, to report that he had met with appellant that day and that appellant had made threats on Charles Pulliam, his immediate supervisor; Dale Jacobs, the Revenue Area Audit Manager; Benjamin Morrison; and anyone else who had the authority to keep appellant in Mr. Pulliam's group. The letter states that Dr. Pettigrew also advised Mr. Morrison that he thought appellant capable of multiple homicide and suicide and advised that it would be better to keep Mr. Pulliam away from appellant. The letter recites that on January 24, 1985, Mr. Slaughter advised appellant that his co-workers and other employees were fearful to work with appellant, to which appellant responded that no one need fear appellant except possibly Mr. Morrison, Ms. Jacobs, Mr. Pulliam and Oscar Diaz, the Director of Field Examination Services. The letter states that during this meeting, appellant gave Mr. Slaughter a copy of a January 18, 1985 letter from Dr. Pettigrew which emphasized the seriousness of the matter and the "potential for grave consequences." Finally, the letter recites that during a meeting with Mr. Slaughter and Ms. Jacobs on February 4, 1985, appellant stated that if he had any more trouble with Mr. Pulliam or if Mr. Pulliam violated appellant's rights, appellant would take care of Mr. Pulliam and Ms. Jacobs on his own terms.
On March 6, 1985, counsel on behalf of appellant filed a request for appeal, wherein appellant complains of his termination. Appellant alleges that he received the letter of removal on February 8, 1985, after he was called in from sick leave. Appellant denies having met with Dr. Pettigrew on January 22, 1985, and denies having threatened anyone. Appellant admits meeting with Mr. Slaughter on January 24, 1985, denies that he had taken any action which would cause his co-workers to fear him and denies that his co-workers feared him. Appellant alleges that he had been on sick leave since January 21, 1985, that Mr. Slaughter called him in on January 24, 1985, while appellant was on sick leave, in an attempt to obtain threatening words from appellant. Appellant denies having threatened anyone during the meeting with Mr. Slaughter, but admits that he gave Mr. Slaughter a letter from Dr. Pettigrew which recommended a transfer to another work group. Appellant admits meeting with Mr. Slaughter and Ms. Jacobs on February 4, 1985, but denies threatening anyone. Appellant alleges that he only expressed his inability to continue working with Mr. Pulliam. Appellant alleges that other employees had difficulty working for Mr. Pulliam and that in 1984, Sharon Lockhart accepted a demotion to be transferred out of Mr. Pulliam's group. Appellant also alleges that he filed a harassment complaint against Mr. Pulliam with the E.E.O. Officer. Appellant contends that alleged statements made to or from a psychologist *242 are not legal grounds for termination and that there was no impairment to the efficiency of the public service. Appellant alleges that no action of appellant caused his supervisors to fear him, that fear was caused by appellant's supervisors who ignored the confidentiality of medical reports, advised field supervisors to tell their subordinates to evacuate the building because appellant was coming to work, and secured the services of guards to protect employees from appellant. Appellant alleges that since October 27, 1984, he has been going through the chain of command in an attempt to be transferred out of Mr. Pulliam's group, but all of his efforts had been unsuccessful, and that on January 15, 1985, appellant requested leave without pay until he could be transferred away from Mr. Pulliam, but this request was also denied. Appellant alleges that on January 17, 1985, he advised Mr. Morrison and Ms. Jacobs that he could no longer work with Mr. Pulliam and Mr. Morrison responded that if appellant did not work with Mr. Pulliam, appellant would be charged with insubordination. Appellant also alleges that Ms. Jacobs told him that if he brought in a letter from a psychologist advising a transfer, she would transfer appellant. Appellant contends that the letter he brought in on January 24, 1985, was in response to Ms. Jacobs' suggestion and that on January 24, 1985, Mr. Slaughter advised appellant that he would be transferred. Appellant alleges that he has been discriminated against for not being able to work with Mr. Pulliam, and that on February 8, 1985, Mr. Pulliam was transferred to a non-supervisory job for allegedly causing the problems with appellant. Appellant contends that the discrepancy between Mr. Pulliam's punishment and his is discriminatory because both actions were taken because of mutual incompatibility. Appellant alleges that any remarks he made which have been interpreted as threats related to his commitment to pursue all legal avenues to get a transfer away from Mr. Pulliam. Finally, appellant alleges that he has attempted to obtain copies of the tape recordings of the January 24, 1985 and the February 4, 1985 meetings but the Secretary of the Department of Revenue and Taxation has denied this request. As relief, appellant requests reinstatement, back pay, expungement of his personnel file and attorney's fees.
A public hearing was held before the State Civil Service Commission on June 4, 1985, in Baton Rouge. Based on the evidence presented, the Commission makes the following findings.

FINDINGS OF FACT
1. Appellant was an Auditor III in the Field Audit Section. Originally, he was assigned to Ms. Frances Haisty's group. In April or May 1984, appellant was assigned to Charles Pulliam's group.
2. Charles Pulliam was the Group 1 supervisor. He reported to Dale Jacobs, the Area Audit Manager. Ms. Jacobs reported to Ben Morrison, the Assistant Director of Field Examination Services, who reported to Oscar Diaz, the Director. Mr. Diaz reported to Ralph Slaughter, the Assistant Secretary, who reported to Shirley McNamara, the Secretary.
3. Appellant testified that immediately after he learned that he was to be assigned to Mr. Pulliam's group, he asked for a transfer. Appellant also testified that he complained to Dale Jacobs, the Area Audit Manager, about Mr. Pulliam, but nothing was done, so appellant decided to document his complaints in writing.
4. By memorandum dated October 22, 1984, appellant advised Ms. Jacobs that Mr. Pulliam was harassing him. Appellant stated:
"I have no intention of continuing to be this bully's victim for one additional minute. I will not work in any situation where I have to work with Chuck Pulliam. I will never allow myself to be in a position (such as auditing field work or taxpayer meetings) where I am with him, and there are not several witnesses from Revenue. Pulliam always looks around for witnesses before abusing me.
Lately, this abuse has bordered too closely to criminal assault for me to continue *243 to tolerate Pulliam's totally immature and unprofessional behavior."
Appellant asked that a proper solution be effected immediately and that he be placed in either of the other two auditing groups in the Baton Rouge District Office. In this memorandum, appellant provided no specifics concerning his complaint.
5. Ms. Jacobs discussed this memorandum with appellant on October 22, 1984. Ms. Jacobs then called Mr. Pulliam and appellant into her office to discuss the problems. Ms. Jacobs decided that at this point, it would be better for the two men to work out their problems rather than to attempt to transfer appellant out of Mr. Pulliam's group. Ms. Jacobs suggested that appellant remain in Mr. Pulliam's group, but that he not work with Mr. Pulliam in the field for thirty days.
6. At the end of this thirty day trial period, appellant again asked for a transfer. Ms. Jacobs asked appellant if there had been any incidents between Mr. Pulliam and himself and appellant said that there had not been, but that he was afraid that Mr. Pulliam would retaliate against him because of his October 22, 1984 memorandum. Ms. Jacobs told appellant to put his request for a transfer in writing.
7. By memorandum dated November 27, 1984, appellant complained to Ms. Jacobs about Mr. Pulliam's behavior and complained that Mr. Pulliam was punishing him for having reported Mr. Pulliam's previous conduct. Appellant complained that Mr. Pulliam was rude in the office and in his dealings with auditors and taxpayers while away from the office; that Mr. Pulliam claimed that he had not been informed of appellant's progress on a particular audit when Mr. Pulliam had been kept fully informed; that Mr. Pulliam prevented several auditors from talking to appellant and humiliated appellant; and that Mr. Pulliam rated his performance at mid year as unsatisfactory. Appellant asked that something be done to insure that he did not have any contact with Mr. Pulliam.
8. Ms. Jacobs reviewed the November 27, 1984 memorandum and determined that there was no valid reason to transfer appellant.
9. An incident occurred during mid December in New Orleans while appellant and Mr. Pulliam were at a conference. Appellant complained that Mr. Pulliam acted unprofessionally and made a comment which appellant took as an insult. Ms. Jacobs felt Mr. Pulliam should be made aware of how his comments were perceived by appellant and wrote Mr. Pulliam a letter about the incident.
10. At some point during appellant's discussions with his superiors, about his problems with Mr. Pulliam, appellant indicated that he might consider a transfer to Monroe. It was agreed that appellant would go to Monroe for a two week trial period beginning January 7, 1985. On January 11, 1985, appellant returned to Baton Rouge and indicated that he was not interested in being transferred to Monroe.
11. After his return from Monroe, appellant learned that he was still assigned to Mr. Pulliam's group, so he asked Mr. Morrison for leave without pay. Appellant insisted that he would not work with Mr. Pulliam. Mr. Morrison explained to appellant that he needed to make the request in writing; that the administrative unit could grant only so much leave without pay; that a request for an extended period of leave without pay had to be presented to the Assistant Secretary; and that there had to be sufficient reasons for such a request.
12. By memorandum dated January 15, 1985, to Mr. Morrison, appellant asked for leave without pay until he could be transferred to any audit group in Baton Rouge other than Mr. Pulliam's group. At this point, Mr. Morrison did not know if there was another position available for appellant to be transferred into or whether such a transfer could be arranged. Mr. Morrison felt that without more information, the Department of Revenue and Taxation was not in a position to grant appellant leave without pay for an extended, indefinite period of time. Therefore, appellant's request was denied.
13. Later on January 15, 1985, Mr. Morrison, Mr. Diaz and Ms. Jacobs met with *244 appellant. Mr. Diaz indicated that he could grant no more than two weeks of leave without pay. That afternoon, Ms. Jacobs met with appellant and told appellant that he needed a better reason for his request for leave without pay. Appellant asked Ms. Jacobs if his request would be approved if he secured an excuse from a psychologist saying that it was harmful for him to work with Mr. Pulliam. Ms. Jacobs indicated that if appellant obtained a medical excuse, his request could be justified. Ms. Jacobs and appellant looked through the telephone directory and Ms. Jacobs pointed out a psychologist whose name she recognizedC. Gary Pettigrew. Appellant called Dr. Pettigrew's office and explained that he needed a medical excuse and made an appointment for January 18, 1985.
14. On January 18, 1985, appellant met with Dr. Pettigrew. Appellant told Dr. Pettigrew that he wanted Dr. Pettigrew to talk to his superiors at the Department of Revenue and Taxation. Dr. Pettigrew explained to appellant that this might be a dangerous course of action to pursue and that he might want to consult an attorney. Appellant responded that he was aware of the potential problems, but wanted the Department of Revenue and Taxation to be aware of his situation. On January 18, 1985, appellant signed a form releasing "any and all information" concerning himself to Ben Morrison and Dale Jacobs at the Department of Revenue and Taxation. At the hearing, appellant contended that he did not voluntarily sign this release. However, based on the testimony presented, the Commission concludes that appellant did voluntarily sign the release. This release was later revoked in writing on February 26, 1985.
15. Appellant was on sick leave as of January 21, 1985.
16. On January 22, 1985, Dr. Pettigrew called Mr. Morrison and advised him that appellant had threatened Mr. Morrison, Mr. Pulliam, Ms. Jacobs and Mr. Diaz and that they should be cautious with appellant. Dr. Pettigrew also advised Mr. Morrison that he felt that appellant was capable of multiple homicide and suicide and that Mr. Pulliam should be kept away from appellant. Dr. Pettigrew testified that the reason he made this call was that he felt he was legally required to warn the employees of the Department of Revenue and Taxation who had been threatened by appellant.
17. Mr. Morrison immediately reported this conversation to Mr. Diaz. At this time, both Mr. Morrison and Mr. Diaz were shaken up and felt threatened. Mr. Diaz and Mr. Morrison then notified Ms. McNamara, and the personnel office. Arrangements were made to furnish security guards for the next few days. Mr. Morrison contacted Ms. Jacobs, who was home ill and suggested that she not return to the office until they decided what to do about appellant. Mr. Pulliam was also contacted and was told to leave the office.
18. On January 23, 1985, Mr. Slaughter talked to appellant and scheduled a meeting with him for 8:00 a.m. on January 24, 1985.
19. On January 24, 1985, Mr. Slaughter met with appellant. Appellant discussed his complaints concerning Mr. Pulliam and pressed Mr. Slaughter for an answer to his request for a transfer. Mr. Slaughter told appellant that his request for a transfer was still under consideration. Mr. Slaughter gave appellant leave until February 4, 1985, and told appellant to come in on February 4, 1985 to discuss the matter. During this meeting, appellant delivered a memorandum dated January 18, 1985, addressed to Mr. Morrison and Ms. Jacobs from Dr. Pettigrew, wherein Dr. Pettigrew urged them to immediately transfer appellant to another work group during his evaluation period at the clinic. Dr. Pettigrew's memorandum stated that Dr. Pettigrew considered "this to be a serious matter with the potential for grave consequences if not responded to immediately." Dr. Pettigrew's memorandum further advised that appellant had agreed to see him for three sessions as a trial period of treatment. Dr. Pettigrew had prepared this memorandum while appellant was in his office on January 18, 1985, and had given it to appellant to deliver to his superiors.
*245 20. At 8:00 a.m. on February 4, 1985, Mr. Slaughter and Ms. Jacobs met with appellant. During this meeting, appellant said that if Mr. Pulliam violated his rights in the future, he would take care of Ms. Jacobs and Mr. Pulliam, not on their terms, but on his terms. Mr. Slaughter and Ms. Jacobs both perceived this comment as an imminent threat of harm to Ms. Jacobs and Mr. Pulliam. Appellant contended that by this comment, he only meant that he would pursue legal avenues to get away from Mr. Pulliam. During this meeting, Mr. Slaughter stated that appellant would be allowed to go on leave for an extended period of time. After this meeting, Ms. Jacobs granted appellant sick leave for the remainder of the day and for nine days thereafter.
20. Later during February 4, 1985. appellant called Mr. Slaughter to say that he had gone to see Dr. Pettigrew and had hoped that Dr. Pettigrew would say appellant could return to work, but Dr. Pettigrew said no. Appellant advised Mr. Slaughter that he was coming to work anyway. Mr. Diaz called appellant back and told appellant to wait until Monday (February 8, 1985) to return to work. Appellant responded that he was coming in the next day (February 5, 1985). At this point, Mr. Slaughter and Mr. Diaz decided that their only recourse was to terminate appellant.
21. On February 8, 1985, appellant reported for work as instructed by Mr. Diaz. Mr. Slaughter called him in and told him that he was going to be terminated. Appellant asked to meet with Ms. McNamara. Ms. McNamara came in and appellant asked not to be fired and explained why he should not be fired. Ms. McNamara responded that for the welfare of the employees of the Department of Revenue and Taxation and of the public, she could not take that risk. Ms. McNamara read appellant's letter of termination to him and then signed it and gave the letter to appellant.
22. Ralph Slaughter had ordered the Audit Section to be evacuated on January 24, 1985, and on February 4, 1985, the two days that he knew appellant would be reporting to the office for meetings.
23. Mr. Pulliam had previously asked Mr. Diaz for permission to arm himself in case he needed to defend himself from appellant. Mr. Pulliam was reassigned to a Section having more security, effective February 11, 1985.
24. Sharon Lockhart was an Auditor in Mr. Guidry's group. Around November 1984, Ms. Lockhart took a demotion because she understood that within six months, she would be assigned to Mr. Pulliam's group and she had problems working with Mr. Pulliam.

A. CONCLUSIONS OF LAW

PRIVILEGED COMMUNICATIONS
During the hearing, counsel for appellant objected to the testimony of Dr. Pettigrew on the basis that any information appellant gave Dr. Pettigrew was privileged pursuant to LSA R.S. 13:3734 and 37:2366. The testimony revealed that appellant specifically asked Dr. Pettigrew to communicate with appellant's superiors; that Dr. Pettigrew suggested to appellant that this might be a dangerous course of action to pursue and that he might want to consult an attorney; that appellant repeated that he wanted Dr. Pettigrew to contact his superiors; and appellant signed a written release allowing Dr. Pettigrew to disclose information to Mr. Morrison and Ms. Jacobs. Dr. Pettigrew's communication to Mr. Morrison on January 22, 1985, occurred while appellant's consent was in full force and effect. At the hearing, Dr. Pettigrew was not asked to disclose any information which he had not already been disclosed on January 22, 1985, but rather was asked to verify whether or not such a disclosure was made. The Commission concludes that appellant's consent, given on January 18, 1985, operated as a waiver of the privilege established in LSA R.S. 13:3734 or LSA R.S. 37:2366 as to any communications between appellant and Dr. Pettigrew between January 18, 1985, when the consent was given, and February 26, 1985, when that consent was revoked.
While the courts have not been called upon to address whether the filing of a *246 Civil Service appeal constitutes a waiver of the privilege established in LSA R.S. 13:3734, the First Circuit has specifically held that the confidentiality provisions of LSA R.S. 46:56 do not prohibit a state agency from taking disciplinary action based on information contained in otherwise confidential records. See Watson v. D.H.H.R., 394 So.2d 1316 (La.App. 1st Cir. 1981). By analogy, the Commission concludes that neither LSA R.S. 13:3734 nor 37:2366 was intended to allow an employee to assert the privilege and prevent a health care provider from testifying about a prior communication which was made when such communication was fully authorized by the client at the time it was made.

B. PRETERMINATION PROCEDURE
Appellant also argued that his termination violated due process of law in that he was not provided an adequate pretermination hearing. On March 19, 1985, the United States Supreme Court held that a public employee who can only be dismissed for cause (such as appellant herein) must be afforded certain procedures prior to his termination. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). In Loudermill, the Court held that prior to his termination, a public employee who has a property right in his continued employment must be given oral or written notice of the charges against him, an explanation of the employer's evidence and an opportunity, either orally or in writing, to present his side of the story or to explain why the proposed action should not be taken. In Loudermill, the Court did not address the issue of retroactivity of its decision, nor did the Court define an appropriate remedy if a termination was accomplished without the benefits of the safeguards therein pronounced.
In this appeal, appellant was terminated on February 8, 1985, which was before Loudermill had been decided. Even if the Loudermill decision is later determined to have retroactive application, the Commission concludes that appellant was afforded sufficient pretermination safeguards under the circumstances. Appellant was advised by Mr. Slaughter that he was going to be terminated and was told the reasons therefor. Appellant asked to talk to Ms. McNamara, the Secretary of the agency. Ms. McNamara read the letter of termination to appellant, which letter explains in detail the reasons for appellant's termination and the sources of the information. Appellant was allowed to explain to Ms. McNamara why he should not be terminated. Ms. McNamara listened to appellant, but felt that she could not take the risk of appellant's continued employment. The Commission concludes that, in this case, where the very reason for appellant's termination was that the employer perceived a significant hazard in keeping the employee on the job, the procedure afforded was adequate, even if the Loudermill decision is deemed applicable.
The Commission observes that in Loudermill, the Court suggested that if the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending the employee with pay. While under Ohio law, this may have been permissible, the Civil Service Rules do not allow a suspension with pay. See Civil Service Rule 1.40. Furthermore, appellee herein attempted to keep appellant away from the office by granting him the use of leave until the situation could be resolved, which would have allowed appellant to be paid while he was off. However, appellant would not remain away from the office and contended that he did not need the leave.
The Commission concludes that by its decision in Loudermill, the United States Supreme Court did not intend to nullify all terminations which were effectuated prior to the decision which did not afford public employees the procedural safeguards announced in Loudermill. The Commission further concludes that even in the event Loudermill is given retroactive application, appellant herein received all the process due.

C. THE MERITS
Appellant was terminated for essentially two reasonshis own behavior in insisting *247 that he would not work with Mr. Pulliam and his psychologist's professional opinion that he was capable of carrying out threats against four supervisory employees if appellant's demands for a transfer were not met.
Appellant repeatedly stated that he would not work under Mr. Pulliam's supervision. Ms. Jacobs attempted to resolve the problem by allowing appellant to work in the field without Mr. Pulliam accompanying him on a thirty day trial basis. Even though appellant encountered no difficulty during this thirty day trial period, he insisted that this solution was unacceptable because he feared Mr. Pulliam might do something in the future. Appellant was allowed to go to Monroe for a two week trial period, but returned from Monroe after one week, finding the Monroe assignment unacceptable. When appellant learned that he had not been transferred out of Mr. Pulliam's group, appellant asked for leave without pay until he could be transferred. Had appellee accommodated this request, appellant would have been performing no service for the Department of Revenue and Taxation, yet he would have been incumbering a position and therefore, no one could be hired to perform appellant's duties. Essentially, by his actions, appellant delivered an ultimatum to his employereither accommodate his request for a transfer or appellant would not continue to work. When all else failed, appellant tried to obtain a recommendation from a psychologist that he be transferred.
Appellant met with Dr. Pettigrew for about one and one half hours on January 18, 1985, during which session appellant made statements about Ms. Jacobs, Mr. Pulliam, Mr. Morrison and Mr. Diaz, which Dr. Pettigrew, a trained professional, perceived as threats of bodily harm. In his professional opinion, Dr. Pettigrew concluded that appellant was indeed capable of carrying out these threats. Dr. Pettigrew obviously took the threats seriouslyto the extent that he felt that he was legally compelled to warn the persons who had been threatened. When appellant's threats were communicated by Dr. Pettigrew to the employees involved, they too took them seriously. Security was arranged and the Field Audit Section was evacuated on the days appellant was to report to work. During the February 4, 1985 meeting, appellant made remarks which both Mr. Slaughter and Ms. Jacobs perceived as threats of physical harm against Ms. Jacobs and Mr. Pulliam.
Article X, Section 8 of the Louisiana Constitution of 1974 requires that there be cause for the removal of a permanent classified employee. The courts have interpreted cause as conduct which impairs the efficiency of the public service being rendered and which bears a real and substantial relation to the efficient operation of that service. See e.g. Newman v. Department of Fire, 425 So.2d 753 (La.1983); Imbornone v. Department of Police, 461 So.2d 1095 (La.App. 4th Cir.1984); Coleman v. Department of Health and Human Resources, 461 So.2d 583 (La.App. 1st Cir.1984); Thornton v. DHHR, 394 So.2d 1269 (La.App. 1st Cir.1981); Leggett v. Northwestern State College, 242 La. 927, 140 So.2d 5 (1962); Dent v. Department of Corrections, 413 So.2d 920 (La.App. 1st Cir.1982); Williams v. Housing Authority of New Orleans, 425 So.2d 1310 (La.App. 1st Cir.1983); Jones v. Department of Health and Human Resources, 430 So.2d 1203 (La.App. 1st Cir.1983).
In this appeal, the efficient operation of the Department of Revenue and Taxation was severly hampered. Not only did appellant's supervisors invest an untold number of hours meeting with appellant and with each other concerning appellant's situation, the Department of Revenue and Taxation felt compelled to provide additional security which would have otherwise been unnecessary. The Commission concludes that the operation of the Department of Revenue and Taxation was sufficiently impaired to warrant appellant's removal.
Appellant contended that he threatened no one and that by his comments, he meant that he would bring legal action against the parties responsible for keeping him in Mr. Pulliam's group. However, everyone who heard his comments, including Dr. Pettigrew, *248 perceived appellant's comments as threats of physical harm. While it is impossible to predict what a person will do, the Commission concludes that Ms. McNamara was amply justified in believing that she could not afford the potential risk of appellant's continued employment.
Accordingly, this appeal is denied.
 s/ James R. Smith
 James R. Smith, Chairman
 s/ Marshall J. Ryals
 Marshall J. Ryals, Vice-Chairman
 s/ A.J. Capritto
 A.J. Capritto, Member
 s/ James A. Smith
 James A. Smith, Member
Commissioners David D. Duggins, Edwin C. Harbuck and Dianne C. Troullier were absent and do not participate.

ON REHEARING
We granted a rehearing so that we might clarify certain statements made in our original opinion.
The record clearly shows, as is stated in the opinion of the State Civil Service Commission which we annexed to our original opinion, that the due process requirements set forth in Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1984) were not violated, as Mr. Flowers was given an opportunity to respond to the proposed termination, both to Mr. Slaughter and to Ms. McNamara, the latter of whom read a letter of termination to Mr. Flowers and gave Mr. Flowers an opportunity to explain why he should not be terminated. It was only after the response was given that the termination was effected, which was based upon the "significant hazard in keeping the employee on the job...."
We did not err in stating that the Civil Service Commission is accorded "great discretion" in matters of termination, so far as the exercise of the discretion of its members in determining whether or not a termination should take place, given certain facts, is concerned. The leading case on the review of determinations by the Civil Service Commission is Walters v. Department of Police, 454 So.2d 106 (La. 1984). In that case, the Louisiana Supreme Court states that in reviewing the Civil Service Commission's findings of fact the court should not reverse or modify its finding unless it is clearly wrong or manifestly erroneous. In a court's determining whether or not the Commission exercised its discretion properly in punishing an infraction, once the facts are established, the Commission's order should not be set aside unless it is arbitrary, capricious, or characterized by abuse of discretion. As we stated in our original opinion, given the facts, about which there is almost no dispute, we find no abuse of discretion in the Commission's upholding of the termination of Mr. Flowers.
Accordingly, our original decision is reinstated, at appellant's cost.
ORIGINAL OPINION REINSTATED.