540 So.2d 1160 (1989)
Jessie Marie Weathers CRONIER
v.
John Marshall CRONIER.
No. 88 CA 1505.
Court of Appeal of Louisiana, First Circuit.
February 28, 1989.
Leo J. Landry, Jr., Judycki & Landry, Morgan City, for plaintiff.
Nicholas F. Larocca, Jr., Lippman, Mahfouz, Martin & Larocca, Morgan City, for defendant-appellant.
Before CARTER, LANIER and LeBLANC, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment granting the parties a separate from bed and board and awarding custody of three minor children to the mother, subject to the father's visitation rights. The trial court judgment restricted the father's visitation with his minor daughter.

*1161 FACTS
The trial judge, in his written reasons for judgment, correctly set forth the pertinent facts and a succinct synopsis of the testimony of each witness. A copy of the reasons for judgment, which we adopt as our own, is attached hereto as "Appendix 1."
The father appealed the trial court judgment assigning the following errors:
1. The trial court committed error in admitting the testimony of the Department of Health and Human Resources case worker and clinical psychologist in evidence contrary to the provisions of La.R.S. 46:56.
2. The trial court abused its discretion in restricting appellant's visitation with his children in the absence of proof by a preponderance of the evidence that appellant subjected his child to sexual abuse.

ADMISSIBILITY OF TESTIMONY
The father contends that the trial court erred in admitting the testimony of the social worker and clinical psychologist who investigated the allegations of sexual abuse and/or evaluated the parties relative to the allegations of sexual abuse. The father reasons that LSA-R.S. 46:56 provides that such information is confidential and prohibits the release of such information for any purpose not directly connected with the administration of DHHR programs. The father contends that because the information gathered pursuant to such an investigation was admitted in contravention of LSA-R.S. 46:56, the matter should be remanded for retrial, excluding the confidential information.
LSA-R.S. 46:56 H provides as follows:
(1) Information pertaining to foster care of children, reports and investigations on abuse or neglect of children, and records of other child welfare services administered by the department, including handicapped children's services, nutrition, immunization, and other medical and public health services records pertaining to children and where such records are in the custody of parish health units or regional and central offices of the office of preventive and public health services of the Department of Health and Human Resources, shall not be subject to subpoena in any judicial proceeding for legal separation, for divorce, or for custody of children incidental to a proceeding for legal separation or divorce.
(2) In the event of the issuance of a subpoena for such information, or for any representative or employee of the Department of Health and Human Resources or any of its offices to testify concerning the contents of any such record as described in Subsections B and H of this Section, the attention of the court shall be called to the provisions of this Section. Counsel for the department may request counsel for the party against whom such evidence and testimony is intended to be used to assist in obtaining a timely stay order to quash the subpoena. If the court for good cause shown, refuses to quash the subpoena, the department and its employees shall then comply as directed by the court. (Emphasis added).
A careful reading of this statutory provision shows that the statute clearly permits representatives or employees of DHHR to testify concerning the contents of its records if the court, for good cause shown, refuses to quash the subpoena. "Good cause shown" is not specifically defined in LSA-R.S. 46:56, and there is little jurisprudence interpreting the statute. See State v. Stamm, 527 So.2d 367 (La.App. 4th Cir. 1988) and Watson v. Department of Health And Human Resources, 394 So.2d 1316 (La.App. 1st Cir.1981). However, in cases involving the medical privilege of LSA-R.S. 13:3734, the court has determined that, although suits for separation and divorce are not statutorily enumerated exceptions to the general prohibition against the disclosure of information made to a health care provider, certain circumstances warrant an implied waiver or justify abrogating the privilege.
In Arsenaux v. Arsenaux, 428 So.2d 427 (La.1983), the Louisiana Supreme Court stated:

*1162 LSA-R.S. 13:3734 provides that, in civil cases, a patient has a privilege to refuse to disclose any communication made to a health care provider which enables the provider to diagnose, treat, prescribe or act for the patient except in certain instances. The exceptions are: the contest of a will or an instrument transferring property by one deceased; death cases; workmen's compensation suits; and personal injury actions. Suits for separation and divorce are not included in the enumerated exceptions.
* * * * * *
The statute is quite clear about which civil cases constitute a "consent" or waiver of the medical privilege. See Wing v. Wing, 393 So.2d 285 (La.App. 1 Cir.1980). Since the legislature had delineated the civil suits which waive the privilege, an additional judicial exception would contravene the statute and flout the law. LSA-C.C. art. 13. Because Ms. Arsenaux's physical condition is not an essential element of her suit, no implied waiver of the privilege should be inferred. Compare Randa v. Bear, 50 Wash.2d 415, 312 P.2d 640 (1957).
Not only is the trial court's interpretation of the statute correct, but there are strong constitutional considerations weighing against admission of this evidence. The Louisiana Constitution of 1974 provides in Article 1, § 5, that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy...." Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) recognized a constitutional right to privacy concerning abortion in the early stages of pregnancy. Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) held that a woman is protected from husbandly as well as governmental intrusion in deciding whether to terminate a pregnancy. This constitutional right to privacy is not absolute but can only yield to a compelling state interest. Roe v. Wade, supra. No compelling state interest requires an invasion of the right to privacy here. See The Abortion Privacy Doctrine: A Compendium and Critique of Federal Court Abortion Cases by Professor Lynn D. Wardle.
The court of appeal erred in reversing the trial court's ruling on evidence relative to the alleged abortion. The wife did not waive her statutory privilege and right to privacy by filing suit for separation and contending that she was free from fault. (footnotes omitted) [428 So. 2d at 429-430]
In Dawes v. Dawes, 454 So.2d 311 (La. App. 4th Cir.1984), writs denied, 457 So.2d 18 (La.1984), our brethren of the Fourth Circuit refused to quash a subpoena duces tecum and determined that in custody matters, especially when the mental and physical health of the parties is at issue, records, which might otherwise be privileged pursuant to LSA-R.S. 13:3734, are subject to disclosure. The court stated:
[T]he plaintiff's physical and/or mental conditions are essential elements to his action for joint custody. That is, there exists a rebuttable presumption that joint custody is in the best interest of the child. C.C. Art. 146(C). However, the presumption may be rebutted by a showing that it is not in the best interest of the child. C.C. Art. 146(C)(2). In order to make such a showing, evidence may be introduced regarding the fitness of the parent to care for the child, including among other factors, the moral fitness of the parties involved as well as the mental and physical health of the parties. C.C. Art. 146(C)(2)(f) and (g).
Contrary to the allegations of the respondent, these records form part of the best evidence of these issues.
Accordingly, we vacate the order of the trial court which quashed the defendant's subpoenas ducas (sic) tecum and we hereby reinstate those subpoenas previously issued. [454 So.2d at 313]
This court in Carney v. Carney, 525 So.2d 357 (La.App. 1st Cir.1988), writ denied, 530 So.2d 88 (La.1988) followed the rationale espoused in Dawes v. Dawes, supra.
*1163 In the instant case, the record reflects that DHHR filed a motion to quash the subpoena under LSA-R.S. 46:56 for the records and testimony of the social worker and the results of her investigation regarding allegations of sexual abuse of the minor daughter. The trial court denied the motion to quash the subpoena. At trial, the social worker refused to testify asserting the confidentiality statute, LSA-R.S. 46:56 H and I. The father also objected to the social worker's testimony. Thereafter, the trial court ordered the social worker to testify regarding the results of her investigation. Likewise, the testimony of Dr. Henry Lagarde, the clinical psychologist who interviewed the father, the mother, and the child, concerning the allegations of sexual abuse, was met with an objection pursuant to LSA-R.S. 46:56, which objection was overruled.
In his answer to the mother's petition for separation, the father requested joint custody. LSA-C.C. art. 157 provides that "[i]n all cases of separation and divorce, and change of custody after an original award, permanent custody of the child or children shall be granted to the parents in accordance with Article 146." Under LSA-C.C. art. 146, the standard to be applied by the trial court in determining the custody of a child of a dissolved marriage is that of the "best interest of the child." Turner v. Turner, 455 So.2d 1374 (La.1984); Carney v. Carney, supra; Swope v. Swope, 521 So.2d 656 (La.App. 1st Cir.1988). The "best interest of the child" is of paramount importance transcending all rights and preferences of the parents and should be the sole criterion in making an award of custody. Turner v. Turner, supra; Carney v. Carney, supra; Swope v. Swope, supra. LSA-C.C. art. 146C(2) specifies the factors which a trial court must consider in determining whether joint custody is in the best interest of the child.[1] Among the factors to be considered are the mental and physical health of the parties. LSA-C.C. art. 146C(2)(g); Carney v. Carney, supra.
Therefore, the father's physical and/or mental condition and the results of the investigations of the allegations that he sexually abused his daughter are critical to his action for joint custody. While there exists a rebuttable presumption that joint custody is in the best interest of the child, this presumption may be rebutted by a showing that it is not in the best interest of the child. LSA-C.C. art. 146. The fitness of the father is essential to a determination of custody and visitation. The evidence presented by the social worker and the clinical psychologist provide valuable information for the court to make the determination of "best interest of the children." Clearly, there has been a showing of "good *1164 cause" for the disclosure of the confidential information, and the trial judge did not err in ordering its disclosure. Cf. Flowers v. Department Of Revenue And Taxation, 507 So.2d 240 (La.App. 1st Cir.1987), writ denied, 513 So.2d 286 (La.1987) and Thibodeaux v. Judge, Juvenile Division Of Fourteenth Judicial District Court, 377 So.2d 508 (La.App. 3rd Cir.1979).

RESTRICTION OF VISITATION
The father contends that the trial judge abused his discretion in the restriction of visitation privileges. The father reasons that there is insufficient proof of sexual abuse, by a preponderance of the evidence, to warrant such restriction of visitation.
It is well settled that the paramount consideration in determining visitation rights following a separation or divorce is the welfare of the child. Duplantis v. Monteaux, 412 So.2d 215 (La.App. 3rd Cir.1982); Gowins v. Gowins, 391 So.2d 48 (La.App. 3rd Cir.1980); Reavill v. Reavill, 370 So.2d 175 (La.App. 3rd Cir.1979). While a divorced or separated father is ordinarily entitled to visitation with his minor child when custody is awarded to the mother, this right may be regulated, limited, or completely taken away by the court when the father's conduct in exercising this right could injuriously affect the child. Slaughter v. Slaughter, 499 So.2d 1123 (La.App. 3rd Cir.1986); Duplantis v. Monteaux, supra. However, restrictions on child custody and/or visitation should not be employed except in unusual circumstances. Hatchett v. Hatchett, 449 So.2d 626 (La.App. 1st Cir.1984), writ denied, 457 So.2d 11 (La.1984).
In the instant case, the record is replete with evidence of the father's physical and mental problems. In his reasons for judgment, the trial court gave a summary of the testimony of each witness, including the testimony of the father, his mother, and his psychiatrist. The testimony clearly reveals the history of the father's diabetes problem, the complications which result when he fails to properly care for himself, and his serious mental problems, in addition to the serious allegations of sexual abuse. The trial judge allowed the father frequent visitation with the two older sons, but restricted visitation with the two-year-old daughter. The trial judge determined that the father's physical and mental problems, in addition to the allegations of sexual abuse of the daughter, jeopardized the welfare of the child. Under these circumstances, the trial judge had a duty to regulate the visitation rights of the father to protect the daughter. We find no abuse of discretion.

CONCLUSION
For the foregoing reasons and the reasons assigned by the trial judge, the judgment of the trial court is affirmed. The father is assessed with all costs.
AFFIRMED.

REASONS FOR JUDGMENT
Mr. and Mrs. Cronier were married in 1973 and of that union three children were born, namely Marshal, now 14, Robert, now 9, and Jenny, age 2. They have sued for a legal separation and for the usual orders consistent therewith, but the most important issue in the case seems to be the question of visitation rights with Mr. Cronier and the children, particularly Jenny. The case started on April 12, 1988, then recessed to April 19 when it was concluded.
Mr. Cronier testified under cross examination that he does have a mental and physical problem, due to diabetes. He forgets certain things, he is on insulin and other medicine, and a restrictive, hard diet, and he said that if he does not follow the diet he gets spells. He passes out. On the occasions when he has passed out, sometimes he can hear people talk about him, but he cannot function. This happened about four times; once when he was with his wife, two times when he was at his mother's home, and on another unspecified occasion. On one occasion at his mother's home the Acadian Ambulance people were called to take him to a hospital but he ended up in the Parish Jail instead. He has a machine that checks his blood sugar and *1165 if it is high there are certain things that he has to do.
Mr. Cronier does not have a good education. He went as far as the ninth grade but failed very frequently and ultimately gave up. He did, however, serve with honor in the National Guard and did 24 years of general labor services satisfactorily with the McDermott Corporation. One day in August of 1986, while working at McDermott, he passed out and a fellow worker who was a diabetic brought him home and helped him recover, but as a result of this the McDermott people retired him and they have placed him on a disability pension whereby he receives a little over $860 a month from them. He has no other income and he has applied for a Social Security Disability payment but has not received it yet. The lawyer suggests that he has appealed the Social Security denial of benefits and that he will ultimately receive these benefits, including a backlog of some $20,000 in benefits.
Mr. Cronier testified that he and his wife lived in Labadieville. After the August 1986 incident he stayed at home but his wife worked as a practical nurse in a hospital or a nursing home. While they were living together they had many money problems. The mortgagee who held a note on their trailer threatened to foreclose. He and his wife got into frequent arguments, and on one occasion she packed up his clothes and threw him out. He admits that he was getting ready to leave when this happened, and he moved to his mother's home. He denies ever threatening his wife or the children, stating that he is not crazy that he just forgets things.
He admits mentioning to his wife on one occasion that he may have threatened suicide but he told this to her and not to the children nor anyone else. Mrs. Cronier disputes this and says that he has said it frequently in her presence and those of her children.
He states that he never did discipline the children and usually left this up to his wife, although on some occasions he would pretend to discipline them. He and his son Robert do not get along very well, and he notes that Robert has a bone deterioration disease that requires medical attention.
Concerning the visits with the children, he states that he would like to take them out boating or water skiing and have them visit him for longer visits.
In September of 1987 the parties thought that they had concocted a visitation agreement whereby Mr. Cronier would see the children, however, it was never perfected and is the subject of some dispute at this trial which commenced on April 12, 1987. He says that the purported stipulation was in error concerning the place where these visits would occur. He did not agree that the visits would be at his mother's home under her supervision.
The main problems concerning these visitation rights had their inception on October 5, 1987. On that date Mr. Cronier was admitted to the Bayou Oaks Hospital and stayed there until October 30, 1987, under the care of Dr. Don Carlos, a psychiatrist. He was released on October 30th, a Friday, and at that time had some dispute with his mother who came to pick him up. However, because of a misunderstanding, she left early and he walked from the hospital in Houma to Morgan City. Ultimately that weekend he went with the police to pick up his two boys who were staying with a baby-sitter as it was his regular turn, and he did not notify his wife about this. He testified that his lawyer said it was permissible to do that as it was his weekend to have the children.
Apparently two weeks later on the weekend of November 14, the three children came over to visit him at his mother's home. The two boys went to a show and came back after 10:00 p.m. and his mother, Mr. Cronier and Jenny and later the two boys spent the night there. He specifically denies that there was any sexual abuse then, nor at any other time, concerning Jenny.
Mr. Cronier has filed a reconventional demand seeking a separation, claiming that Mrs. Cronier, who is better educated, belittled him, made him sit in the back of the car, refused to give him his insulin shots, would not cook the proper food for his *1166 special diet, and in general gave him a bad time. He admits that he and Robert had problems and could not get along. He says that since the separation his wife would not let the children call him on the telephone and would not let him know if they were sick or needed him. He understands there are some financial problems and has learned that Mrs. Cronier's stepfather, L.G. Dover, apparently must help with some bills.
Concerning visitation, although he has passed out on four occasion, he says he is alerted to when this is coming and if the children were with him he could get help in advance. He feels that his education level interfered with getting along with his wife, but not with raising the children nor earning a living. He says that while his wife was working or sometimes working late at night, he would take care of the children. Apparently when he retired from McDermott he received some stock which was turned over to Mr. Dover to help pay for some bills that had accrued during the marriage. Mr. Cronier is not exactly sure what transpired at this time. He also complains that his wife would call him stupid in front of the children.
One of the witnesses in the case was Officer James Blair with the Morgan City Police Department, who explained what happened with the incident involving bringing Mr. Cronier to jail. He said that he had received a complaint from Acadian Ambulance that they were called to pick up Mr. Cronier at his mother's and he was visibly agitated and would not go with them, and was generally causing a lot of trouble. Mr. Blair and another officer went there and learned that Mr. Cronier's mother feared for her safety as he would go into fits and raise all kinds of commotion. A call from the Coroner apparently occurred and the officers felt that the best thing to do was to take Mr. Cronier into the safety of the jail and book him for disturbing the peace. They learned that he was a diabetic and that perhaps this caused some of the problems.
Mrs. Jessie Cronier testified that on May 29, 1987, Mr. Cronier left the marital domicile. They had been talking about separating for sometime, but decided that they would wait until the children finished the school semester. However, on May 29th, Mr. Cronier got a disability check, it was cashed, she got $40 of the money, and he said there was no reason why he should hang around anymore, so he left. He packed his clothes and moved to his mother's home. She concurs that they had many money problems. They also had fusses and disputations and they both went to a counselor at the mental health clinic to try to work something out. Because of this and other matters, Mr. Cronier threatened Mrs. Cronier and said that he would get even with her, but he did not say how. These visits to the mental health clinic started in February or March of 1987. She said that Mr. Cronier had mood swings. He would not follow his diet and when he ate bad food he would go into these periods of depression and anger. Mr. Cronier gets along well with Marshal, the 14-year-old, but did not get along with Robert, who has Severs Disease, which is a softening of the bones in the feet. They had medical bills to compound their financial problems, and with the disability and her clearing $500 every two weeks, it was just not enough to get along and they had to lose the trailer they were living in. Mr. Cronier also had to go to an allergist frequently and Mrs. Cronier tried to get him to go on fewer occasions so that they could save some of that money. His mood swings and rages occurred frequent perhaps two or three times a week, then when he calmed down he would say that he did not remember what occurred. Before they physically separated, Mr. Cronier said that he tried to get Social Security but later said that he had enough money. However, ultimately they did make a claim.
Mrs. Cronier testified about her expenses, showing that she grosses about $950 a month, and needs a lot of money to help with the children, and seeks to recover child support payments from Mr. Cronier. Besides Robert, Jenny has ear problems and Marshal is getting at the age where he has started to date girls and he needs additional funds.
*1167 In September of 1987 when the parties were near to the court date, she says that there was a stipulation entered into and he was supposed to have certain visitation rights and the arrangement was that he was supposed to call first to set up the time when they would occur. The first time, everything seemed to be satisfactory but Jenny came back with a lot of insect bites and it was necessary to take her to see Dr. Blereau.
On October 3rd and 4th, the visits seemed to go along satisfactorily also, but on October 5 she got a call from Dr. Carlos telling about her husband being hospitalized.
On October 28, Mr. Cronier's mother went over to Mrs. Cronier's home to pick up the blood machine and apparently gave information from Dr. Carlos that Mr. Cronier would do well after his visit at the psychiatric hospital.
Mrs. Cronier says that she did not know that her husband was released on October 30th, and she only learned on October 31st, after she went to work, that the boys were picked up and brought to Mr. Cronier's residence. Jenny was with a sitter that day and did not make that trip. She had found out that Mr. Cronier had picked up the children and she was very upset because she had not anticipated this and did not know that he was coming home. She went to the Morgan City Police Department and picked up the boys and returned them to her home.
Two weeks later, arrangements were made for Mr. Cronier to get all three of the children.
After the visits Jenny usually wanted to stay with her father, as she apparently enjoyed the visits, but not on this special occasion. She was withdrawn. Mrs. Cronier brought Jenny to a baby-sitter and told the baby-sitter that Jenny was all dirty and asked her to bathe Jenny, then she had to go to work. Apparently Mrs. Cronier was to return from work in Napoleonville to their now residence in St. Mary Parish, however, as she went to get into her car in Napoleonville something was broken. She called the baby-sitter to tell her that she may have to stay in Napoleonville, and the baby-sitter was somewhat upset, however, Mrs. Cronier stayed there and returned the next morning. It was when she picked up Jenny the next morning from the baby-sitter that she was made aware that there may have been sexual abuse by Mr. Cronier concerning Jenny. Jenny was crying at the time, she pointed to her vaginal area, and said "Daddy hurt me." She immediately made arrangements to see Dr. Blereau who examined Jenny, and heard the words blaming "Daddy" for her problems. Mrs. Cronier recalled that Mr. Cronier said at one time that if could not get sex from her that he would get it from Jenny, but at the time Mrs. Cronier felt that he was sick in the head and they separated shortly after that. Concerning the visits, she does not object to Mr. Cronier seeing the boys as she has discussed it with them and thinks that they could go over there for a couple hours every two weeks but not overnight. She does not feel that Jenny should have any visits at all until she learns that Mr. Cronier has been stabilized for a long time. She seeks a legal separation from him. She is not pleased with Mr. Cronier's mother because that woman yells at her at certain times when the children are being picked up, so she finally quit going there.
Mrs. Cronier testified that she used to give Mr. Cronier insulin shots until about two years ago when he bought a machine that would do this, but she had continued to check his blood sugar level until the separation. She states that her husband became disabled in August of 1986 and about all he would do after that was stay at home and watch television. He would not hunt or fish nor go drink beer with the boys, nor even baby-sit. Frequently it was necessary to get a baby-sitter for Robert and Jenny even though he was there. She got tired of the financial problems they were having and his constant threats of committing suicide, and she told him because of that they had to get rid of the trailer because of their financial problems, and therefore there should be a separation. She tried to get him on other occasions into a mental hospital but he would not cooperate. *1168 At one time he called and asked for a reconciliation but he was very abusive in his voice and she said there was no hope.
She is aware that her daughter Jenny has dermititis and had been treated for that by Dr. Blereau on several occasions.
Mrs. Donna Bartley is a case worker with the Department of Health and Human Resources and has been working with them for 20 years, primarily investigating child abuse. Her department was alerted to the possible child abuse and on November 23rd they started the investigation. There was no immediate rush because they were aware that the child was no longer living with the father. She talked to Mrs. Cronier, the two boys, Patricia Guillot, who was the Cronier baby-sitter, Dr. Don Carlos, Mr. Cronier's mother, a neighbor, members of the police department, L.J. Dover, and ultimately arranged for Dr. Lagarde, a psychologist, to interview the people. The results of her investigation was her conclusion that there should be no visits by Jenny with her father without close supervision, and this should only occur as long as he followed his diet and was in a calm condition. She felt that visitation rights would be preferable to isolating the child from Mr. Cronier. She sees no problems with the boys visiting their father.
Dr. Robert Paul Blereau is a family physician from Morgan City and has been here for a number of years. On November 16th he had Jenny visit him in his office with Mrs. Cronier. Jenny told Dr. Blereau that, "Daddy hurts," and pointed to her genitilia, her vulva and the opening of her vagina. The child said this in Dr. Blereau's presence and in the mother's presence, and perhaps the nurse was present too. Jenny had redness at the area of the anus consistent with a yeast infection, for which he had been treating her in the past. Her hymen was intact, there was some mucous at the opening of the vagina, but there was no sperm. He noticed some burn on the top of her arm. He called the Social Services of the hospital to alert D.H.H.R. because of possible child abuse. On December 3 he saw Jenny again but this was unrelated to these problems, and he treated her for childhood infections after that. He admitted that his inspection of the vaginal area was normal, but he suspected child abuse because of the child saying "Daddy hurts." He notes that she was about two years and three months old when he saw her.
Patricia Guillot stated that she does not know Mr. Cronier but did know Mrs. Cronier and Jenny as she baby-sat her on occasions. She did baby-sit on November 14 when Mrs. Cronier went there. Jenny was crying and would usually take a nap but she would not do this on this occasion, so Mrs. Guillot bathed her and Jenny still cried and her diaper was changed and cleaned off and Mrs. Guillot's husband was helping to put the diaper on the baby when he pointed out that Jenny did not look normal. Later that night Mrs. Cronier called Mrs. Guillot to talk about the car breakdown and so Jenny spent the night with Mrs. Guillot, crying most of the night. Mrs. Guillot noted that Jenny's bottom was red and raw and perhaps bruised. She stated that Jenny pointed to the vagina and said "Daddy hurt me." She repeated this several times.
Dr. Henry Lagarde is a clinical psychologist of New Iberia who interviewed Mr. Cronier, Mrs. Cronier, and Jenny. He saw Mrs. Cronier on two occasions and Mr. Cronier on two occasions, and Jenny on one. He noted that Mr. Cronier was not present when Mrs. Cronier and Jenny were there. Jenny was distraught when she came to the evaluation, and could not be interviewed. She would not leave her mother's side. Jenny was distracted and agitated and the interview with her was terminated, this on December 23, 1987.
When Mr. Cronier was evaluated, Dr. Lagarde noticed that he was quite agitated. He became angry and denied anything, especially concerning child abuse. Dr. Lagarde said that it took Mr. Cronier about ten minutes to calm down to even start talking. It was a difficult case and Mr. Cronier was having a bad time, and he cried a lot. It became obvious that Mr. Cronier was very dependent upon his wife and his mother. He was very passive and seemed to like it that way. He was of the *1169 opinion that his sexual attitudes were naive and he indicated that the only woman he ever had any desires for was Mrs. Cronier. He apparently has no adult relationships outside of his family. He has little insight and difficulties with his own feelings. Mr. Cronier felt that he did everything for his wife and could not understand her leaving. Dr. Lagarde felt that his pain on his wife's leaving was very real. Mr. Cronier denied molesting his daughter but was uncertain because other people said that he did this, therefore, he was concerned that perhaps maybe something did happen. Mr. Cronier was also very concerned about his mother's health. He talked about his diabetic spells and visits to Lakewood and Bayou Oaks Hospital.
Concerning Mrs. Cronier, Dr. Lagarde felt it was necessary to determine if she was using leverage in this custody dispute. Mrs. Cronier did not come across as being angry and he thought that she left Mr. Cronier because of his temper, black-outs, and tired of the fact that he depended upon her so much. Dr. Lagarde did an MMPI on Mr. Cronier and the results were that he was angry and fighting out against something and he concluded that it was the custody and this court fight. His conclusion is that it is more likely that Mr. Cronier did something wrong and Mrs. Cronier may have some problems too. He noted that Mrs. Cronier was abused when she was a child, but the abuse was one of neglect. He said that Mrs. Cronier indicated that Jenny was an open child and very close to her father prior to the date of the alleged molestation, and she has been just the opposite since then. It is his opinion that this fits into the pattern of abused children. In the event there are visits of Jenny to Mr. Cronier, they would have to be made under strict supervision, but he finds that no restrictions are necessary for the boys.
Dr. Lagarde saw the three Croniers on December 23rd, separately, saw Mrs. Cronier on December 28th, and Mr. Cronier again on January 7, 1988.
On April 19, 1988, at the continuation of the case, Rudy Guillotte, who is the husband of Patricia Guillotte, the baby-sitter, testified that on November 14 Mrs. Cronier had brought Jenny to his home for his wife to baby-sit. He noticed that Jenny was cross and dirty, and his wife bathed the child. Afterwards she asked Mr. Guillotte to diaper the child, which he did, and he noticed that she was red and swollen and he called this to the attention of Mrs. Guillotte. Later in the day he heard Jenny say that, "My daddy hurt me," and that Mrs. Guillotte had mentioned that the child had said it earlier. He had seen Jenny red previously and was aware that Mrs. Guillotte had put some kind of medicine that Mrs. Cronier had left with her, but he had never seen Jenny swollen before.
Mrs. Jessie McLeod is the niece of Mrs. Cronier. She testified that once when she was bathing her daughter while Jenny was there watching, and while cleaning her daughter's derriere, Jenny said that her daddy hurt her and she put her hand behind her legs and complained. Mr. McLeod was aware of the visit to Dr. Blereau and this happened about two days later. She was also aware of problems between Jessie Cronier and her mother-in-law.
Mr. Al McLeod, the husband of Jessie McLeod, testified simply that when the Croniers were breaking up and moving that he was there to help and the Croniers seemed to be peaceful and there was no mention that Mrs. Cronier was throwing Mr. Cronier out.
Grace Prejean of Labadieville testified that she knows the parents and baby-sat for both of them. On one occasion the nine year old child Robbie discussed Mr. Cronier's statements about suicidal tendencies and Mrs. Prejean saw him play-act what Mr. Cronier said he would do and she discouraged him from this type of activity.
Deborah Luke of Labadieville testified that she knows the Croniers and was there when Robbie was acting out Mr. Cronier's statements about suicide.
Merlin Dover from Houma knows the Croniers also. Mrs. Jessie Cronier is the stepdaughter of his brother. He stated that he talked to Mr. Cronier about six months ago, who was very upset about the *1170 separation, and was upset about the fact that he was accused of sexually harassing Jenny, and that he was disgusted about it all and thinking of ending it all. Mr. Dover felt that he was very serious in this conversation.
Mr. L.J. Dover of Berwick testified that Mrs. Jessie Cronier is his stepdaughter and that his wife died last September. He is aware that the parties separated around June of 1987. He had been a witness to several of Mr. Cronier's outbursts and he recalled in particular one Sunday when he and his wife went to visit over there looking for Jessie Cronier and the children, that Mr. Cronier got very boisterous and stated that he did not know where they were and did not care and maybe he would get a gun and shoot himself. Mr. Dover is aware that Mr. Cronier is a diabetic, just as Mr. Dover is. He also stated that on several occasions he loaned money to the Croniers and at one time they told him that they were going to get some McDermott stock and they were going to turn it over to him in payment of the loan. In fact, the stock did come in and it was turned over to Mr. Dover, and he has the stock certificates with a signature and the name of John Cronier on them, and that of a Notary Public, although he did not see Mr. Cronier sign the stock certificates. He has not been able to affect a transfer of this stock because the transfer agent requires a "signature guarantee" from the bank and will not accept the notary's jurat.
For the defense, Jean Gowers of Morgan City testified that she has known Mr. Cronier for two years, she rents trailer space from Mr. Cronier's mother.
She is aware that in the spring of 1987 the Croniers separated. She apparently had been served a restraining order or somehow had possession of this restraining order, and she tried to explain it to Mr. Cronier who did not understand the terms. At this time he was very upset.
She sees Mr. Cronier regularly and has seen the children about three times since the separation. On the first occasion Jenny had to take a bath and Mr. Cronier sent the child to his mother's home for this. The boys and Mr. Cronier would usually stay outside and the girl would stay in the house with her grandmother.
Later, in October, after Mr. Cronier had returned from the hospital, the witness went with Mr. Cronier to pick up the children and there was a big ruckus about this later.
Later, on another occasion, she went with Mr. Cronier to pick up the machine that he needed for his diabetes, and she noticed that Mrs. Cronier was not very happy. On the date of the alleged sexual transgression, the witness was around the trailer most of the day, and she noted on one occasion that Jenny wanted to go to the bathroom and apparently the grandmother took care of this. Sleeping arrangements were apparently such that the child slept with her grandmother. On that day Jenny was in good shape and in good spirits.
Leona Cronier is the mother of John Cronier, and the grandmother of Jenny. She is 75 years of age. She testified that the children have visited her place about three times since the parties separated. She and Jessie Cronier did not get along very well, and one called the other names, and the response was the same. On one occasion she said that she was going to slap Jessie Cronier, but there was no fight, and this Court doubts that there would be as Mrs. Leona Cronier is a small woman. She testified that in November there were no problems with Jenny, although she did complain about burning and Jenny's bottom was red, and Vaseline was placed on it. Jenny complained but it was chaffed like sometimes occurs when a child wears wet diapers. It was no big problem. She stated that Jenny would always sleep with her on the visits. She also testified that on one occasion she had to call the ambulance to take her son John to the hospital. She is not aware of who called the police but it was not her. As a result of this he went to jail, but ultimately apparently ended up at the Bayou Oaks psychiatric hospital in Houma. Now John Cronier takes his medicine for diabetes and other medicines that the Bayou Oaks hospital gave him. She also noted *1171 that when the children come they always go to mass.
Mr. Cronier testified briefly stating that he receives $836 in disability benefits, and he uses this all up on his own expenses and cannot pay child support. However, on cross examination, he admitted receiving a Social Security check in the amount of $10,640 which is apparently the arrearage for the last two years. The conclusion is that his Social Security appeal was successful and he should get Social Security in the future. He does not have hospitalization insurance now, as it was dropped because he could not pay the bills and he cannot get it reinstated.
The evidence is not clear at all whether Jessie Cronier also received $10,640 for these Social Security payments, although there is an indication to that effect. This matter concerning the Social Security payments have just occurred contemporaneously with these hearings and it is the feeling of this Court that if he is entitled to monthly Social Security payments that in turn his children would also be entitled to Social Security payments. Because of this, this Court is not going to enter an award one way or the other concerning child support payments until sufficient information is developed on that question. If in fact the Social Security will award child support payments to the children then perhaps no requirement from Mr. Cronier would be necessary. The evidence also fails to show what kind of Social Security payments Mr. Cronier may receive in the future. This part of the opinion will be held open in the event it is necessary to reexamine the question concerning Mr. Cronier paying child support payments to Mrs. Cronier for the children.
Dr. D.F. Carlos, a psychiatrist from Houma, testified by a deposition taken on March 31, 1988, noting that he is the president of the staff of the Bayou Oaks psychiatric hospital in Houma. He first saw Mr. Cronier on October 5, 1987, when Mr. Cronier was admitted to the hospital, and Mr. Cronier stayed there for twenty-five days. Following that, he has seen him on several occasions. Mr. Cronier was hospitalized because of severe depression over his diabetic condition and his separation from his wife. Dr. Carlos noted that Mr. Cronier had suicidal thoughts and he was erratic. He was euphoric at times and crying later. He was extremely anxious. He had difficulty sleeping and was not eating well. Dr. Carlos was later advised by Jessie Cronier that Mr. Cronier was accused of sexually abusing the child Jenny. Dr. Carlos does not believe that this happened and he felt that there should be no restrictions on the visitation with the children to Mr. Cronier. He felt that Jessie Cronier was giving Mr. Cronier a bad time. He notes that Mr. Cronier is still in remission and does get upset concerning the lack of visitation by the children. He is on antidepressant medicine such as Norpramin, Tegretol and Klonopin, and these medicines should have no adverse effects insofar as the children's visits are concerned. He reiterated that he does not feel that Mr. Cronier is the type of man to abuse a child. He said that he sees no reason why these visits would need to be supervised, unless someone can prove that there was an actual molestation. He said that he thinks the visitation is healthy. The children should see the father and he has the impression from Mr. Cronier that they want to see him. They enjoy the visits. They have a good time and they are very comfortable with their father. This is questionable in part, however, because even Mr. Cronier admits having problems with Robbie, the nine-year-old.
Throughout this case, this Court was naturally concerned about the allegations of child abuse or sexual abuse, because if a firm opinion could be reached, the results concerning visitation would be clear. It is a mixed bag of evidence. On one hand you have, of course, the testimony of a two-year-old child, and the very important testimony of Patricia Guillotte, who in an unsuspecting moment heard the child complain that her father hurt her. The follow-up statements by the child to her mother and Dr. Blereau confirmed this. On the other hand, you have the denial of this by the father, as well as the opinion of Dr. Carlos that he is not the type who would be engaged in such a thing.
*1172 Mrs. Donna Bartley, an expert in these matters, felt that close supervision would be necessary and, in fact, she recommends the visits. Dr. Lagarde used a different word in that he said the supervision should be strict.
Unfortunately, there were only two people involved who really know what happened, and one of them is two years old. Mr. Cronier denies it, but Mr. Cronier also admits that he forgets things and it may well be that he hurt the child and forgot it, either truthfully or conveniently. Whatever the case, this Court is not going to take a chance insofar as the welfare of Jenny is concerned, and this Court will allow visitation rights by Mr. Cronier but, at least for the present, under close and strict supervision. Insofar as Jenny is concerned, and acknowledging her age being tender, and her visits would be necessarily short, this Court will permit Mr. Cronier to visit Jenny for one hour every other weekend in the morning at the residence of Jessie Cronier and under her supervision. This visit shall occur at 9:00 a.m., unless Mrs. Jessie Cronier's work schedule is such that she cannot be there. If that is not a convenient time, then it will have to be at some other time.
Insofar as the boys are concerned, they may visit with Mr. Cronier at the residence of his mother, Mrs. Leona Cronier, but she does not have to supervise these visits as he may wish to take them out to some kind of activity. The visits with the boys shall be as previously worked out among the litigants, that is, the boys will be able to visit with Mr. Cronier from Saturday at noon through Sunday until 4:00 p.m. Should Mr. Cronier display any of the problems that have occurred in the past, such as agitation, mood swings, lack of memory, unstableness, temper tantrums or blackouts, then these visitation rights may be changed. Mr. Cronier will also be allowed to telephone his children and talk to his children, at a telephone number to be supplied by Mrs. Cronier, twice a week in the early evening for calls of short duration. Mr. Cronier shall also be cast for the costs of these proceedings.
Officially in Chambers at Franklin, St. Mary Parish, Louisiana, on this 22d day of April, 1988.
 /s/ Robert M. Fleming
 Robert M. Fleming, Judge
NOTES
[1] LSA-C.C. art. 146C(2) provides as follows:

The presumption in favor of joint custody may be rebutted by a showing that it is not in the best interest of the child, after consideration of evidence introduced with respect to all of the following factors:
(a) The love, affection, and other emotional ties existing between the parties involved and the child.
(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his religion or creed, if any.
(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care, and other material needs.
(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.
(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(f) The moral fitness of the parties involved.
(g) The mental and physical health of the parties involved.
(h) The home, school, and community record of the child.
(i) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(j) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent.
(k) The distance between the respective residences of the parties.
(l) Any other factor considered by the court to be relevant to a particular child custody dispute. However, the classification of persons according to race is neither relevant nor permissible.
(3) For the purpose of assisting the court in making a determination whether an award of joint custody is appropriate, the court may direct that an investigation be conducted.